Rockingham
No. 2004-501

PORTSMOUTH COUNTRY CLUB

v.

TOWN OF GREENLAND

Argued: June 15, 2005
Opinion Issued: September 21, 2005

*Boynton, Waldron, Doleac, Woodman & Scott, P.A.*, of Portsmouth (*Ralph R. Woodman, Jr.*, on the brief and orally), for the plaintiff.

*Peter J. Loughlin*, of Portsmouth, on the brief and orally, for the defendant.

NADEAU, J. The defendant, the Town of Greenland (Town), appeals an order of the Superior Court (*McHugh*, J.) ruling that the Town cannot continue to tax the golf holes on the plaintiff's golf course as improvements in addition to taxing the underlying land as open space. The plaintiff, Portsmouth Country Club (Club) cross-appeals, challenging the trial court's refusal to apply its ruling retroactively and to award the Club attorney's fees. We affirm.

The following facts are recited in the trial court's order or agreed to by the parties. The Club operates an eighteen-hole golf course on 255 acres in Greenland. Following a town-wide revaluation of property in 1987 and an attendant increase in the assessed value of the Club's property, the Club and the Town negotiated a discretionary easement deed pursuant to former RSA 79-A:15-:21 (repealed and replaced by RSA ch. 79-C (2003)). That statute provided a mechanism for taxing land subject to a discretionary easement either according to the current use assessment category specified in the easement or at a "fixed assessment ... which does not exceed the highest per acre valuation of any category of open space land established by the [current use advisory] board." RSA 79-A:18 (1991) (repealed 1996).

The Club's discretionary easement deed, as later amended, provided that 247 acres of the Club's property, which are used for playing golf, would be subject to the easement and classified, "for purposes of current use tax assessment[,] as open space." The remaining five acres, on which a pro shop, clubhouse, "snack shack" and parking lot were located, would be excluded from the easement and taxed at fair market value. Although the deed was not signed until 1991, implementation of its provisions began in 1987.

Since 1992, the current use rate for the 247 acres subject to the easement has been set by the Town at $400 per acre. The Town has also, however, separately assessed the golf holes located on those 247 acres. Prior to 2001, the total additional assessment for these holes was $504,000, and that value was listed on the Club's tax bill under the category of

buildings. Between 1987 and 2000, the Club never inquired about the components of its assessed valuation or complained about its tax bill.

In 2001, another property revaluation was conducted, resulting in an increase in the Club's taxes and prompting an inquiry by the Club into the Town's taxing policies. It was then that the Club first realized that in addition to the current use assessment of $400 per acre, it was being taxed on the value of the golf holes.

The Club applied to the Town for an abatement, which was denied. It then filed a petition for abatement, declaratory judgment and damages with the superior court, contending that according to the discretionary easement deed and applicable statute, the Town could not assess the 247 acres at more than its current use value. The trial court agreed, and ruled that the Town could not assess "any additional tax on the 247 acres of open space land ... except for the agreed-upon current use amount. Thus, the Town cannot independently assess the golf holes and add that amount to the current use amount." The trial court declined, however, to grant a rebate of erroneously-assessed taxes for the years 1991 through 2001 or to award the Club its attorney's fees. The Town appeals the trial court's ruling regarding the method of tax assessment. The Club cross-appeals the trial court's failure to apply its ruling retroactively and to award attorney's fees. We first address the Town's appeal.

The Town argues that golf course components such as tees, fairways and greens are improvements to land, separate from the land itself, and "are properly assessed and taxed separately from the land." It contends that its assessment practice is consistent with the easement deed, in which it "agreed to classify the *lands* encumbered by this easement for purposes of current use assessment as open space." (Quotation omitted.) "The Discretionary Easement Deed," the Town argues, "says absolutely nothing about the improvements to the golf course land." Moreover, it argues that its separate assessment of the golf course components is mandated by the current use statute, which, at the time the discretionary easement deed was executed, directed the selectmen or assessing officials to appraise, at current use values established by the current use advisory board, "open space land, as classified under the provisions of this chapter, *excluding any* building, appurtenance or *other improvement* thereon." RSA 79-A:5, I (1991) (amended 1991) (emphasis added).

The Club, on the other hand, contends that what the Town identifies as golf course improvements are "part of the land" encumbered by the easement and subject thereunder to assessment as open land. The Club argues that this interpretation is consistent with the applicable statutory scheme, which allows land used for a golf course to be eligible for a discretionary easement even though "[a] golf course obviously must have

some improvements to land in its natural condition, all of which are a necessary part of a 'golf course,' i.e. tees, greens, sand traps, fairways, roughs, etc." Thus, the question before us is whether, for purposes of the applicable statute and the discretionary easement deed, golf course components such as tees and greens are to be treated as land or improvements to land.

We begin with the applicable statute, as the discretionary easement deed explicitly conveyed the easement "pursuant to New Hampshire RSA 79-A:15-21," and, in any event, could not contravene the statute. *Cf. Albertson v. Shenton*, 78 N.H. 216, 217 (1916). "In matters of statutory interpretation, we are the final arbiter of legislative intent as expressed in the words of the statute considered as a whole. We first examine the language of the statute and ascribe the plain and ordinary meanings to the words used." *Carignan v. N.H. Int'l Speedway*, 151 N.H. 409, 419 (2004) (citation omitted). We also interpret statutes not in isolation, but in the context of the overall statutory scheme. *In the Matter of Glaude & Fogg*, 151 N.H. 273, 275 (2004).

> When interpreting two statutes which deal with a similar subject matter, we construe them so that they do not contradict each other, and so that they will lead to reasonable results and effectuate the legislative purpose of the statute.

*Sanborn Regional Sch. Dist. v. Budget Comm. of the Sanborn Regional Sch. Dist.*, 150 N.H. 241, 242 (2003) (quotations, citation and ellipsis omitted).

The current use statute in force at the time the discretionary easement deed was executed did not define the term "improvement." *See* RSA ch. 79-A (1991 & Supp. 1995). Nevertheless, even were we to assume that tees, greens and other golf course characteristics would otherwise be improvements for purposes of RSA 79-A:5, I (1991) (amended 1991), we still interpret the overall statutory scheme to treat these features as part of the land on which a discretionary easement has been granted and to preclude their separate taxation as improvements.

RSA 79-A:15, I (1991) (repealed 1996) provided that an owner of land which does not meet the criteria for open space land, so as to qualify for current use taxation under that chapter, but who wishes to keep the land in a use consistent with the purposes of that chapter, could apply to the city or town planning board "for a permit to convey a discretionary easement to the town or city." The planning board was directed to approve the application if it determined that the planned use of such land was consistent with any of a number of enumerated objectives or provided "other similar benefits." RSA 79-A:15, II (1991) (repealed 1996). A

discretionary easement, which had to be for a term of at least ten years, RSA 79-A:18 (1991) (repealed 1996), would bind the owner and any transferees or assignees of the land "not to subdivide, develop, or otherwise change the use of such land to a more intensive use inconsistent with the purposes" of the current use statute, RSA 79-A:17 (1991) (repealed 1996).

RSA 79-A:15, III (1991) (repealed 1996) provided in part that "[i]f the land is used for a golf course, the [current use advisory] board shall give due consideration to the application." Prior to August 17, 1991, the statute also provided that "[a]s directed by the [current use advisory] board, the commissioner [of the department of revenue administration] shall adopt by rule under RSA 541-A, a definition of 'golf course,' based on open space objectives, for the purpose of this subdivision." RSA 79-A:15, IV (1991) (repealed 1991). The parties agree that former New Hampshire Administrative Rules, Rev 1201.04 (repealed 1992) (former Rev 1204.01) defined golf course, "as provided under RSA 79-A:15, [to] mean[] a parcel of *land*, ten acres or more, used in the playing of the game of golf *including* greens, fairways, tees, sand traps, and roughs, and such other areas which are located within the established playing area." (Emphasis added.) The plain and ordinary meaning of these words is that the tees, greens and similar golf course components are included as part of the land.

The Town notes, however, that at the time the discretionary easement deed was signed, the definition of golf course was contained in an administrative rule rather than a statute. *Cf.* RSA 79-C:2, III (2003) (defining "golf course land" for purposes of the current discretionary easement statute). It argues that the current use advisory board's "definition of 'golf course' could not, and did not, allow golf course improvements to be assessed as open space. Such an interpretation would impermissibly contradict the statutory directive that, in appraising open space land at current use values, selectmen exclude from such appraisal improvements on the open space land."

We agree that "[r]ules adopted by State boards and agencies may not add to, detract from, or in any way modify statutory law." *Opinion of the Justices*, 121 N.H. 552, 557 (1981) (quotation omitted). Administrative agencies may, however, properly be delegated the authority to "fill in details to effectuate the purpose of the statute." *Id.* (quotation omitted). "Rules and regulations promulgated by administrative agencies pursuant to a valid delegation of authority have the force and effect of laws." *Id.* at 559.

In providing that land used for a golf course could be subject to a discretionary easement and explicitly directing the current use advisory board and commissioner of the department of revenue administration to

promulgate a definition of golf course, the legislature left a gap for the agency to "fill in details to effectuate the purpose of the statute." *Id.* at 557 (quotation omitted). As the agency was directed to adopt a definition "based on open space objectives," RSA 79-A:15, III (1991) (repealed 1996), we look to the objectives cited by the legislature in the current use statute.

RSA 79-A:1 (1991) (amended 1991, 1996) provided:

> It is hereby declared to be in the public interest to encourage the preservation of open space in the state by providing a healthful and attractive outdoor environment for work and recreation of the state's citizens, by maintaining the character of the state's landscape, and by conserving the land, water, forest, and wildlife resources. It is further declared to be in the public interest to *prevent the conversion of open space to more intensive use* by the pressure of property taxation at values incompatible with open space usage, with a minimum disturbance of the concept of ad valorem taxation. The means for encouraging preservation of open space authorized by this chapter are the assessment of land value for property taxation on the basis of current use and the acquisition of discretionary easements of development rights by town or city government.

(Emphasis added.) As we explained in *Blue Mountain Forest Ass'n v. Town of Croydon*, 119 N.H. 202, 203 (1979), the current use statute promotes these objectives by directing that certain land be valued for taxation purposes at its current, rather than its highest and best, use.

■ As noted above, the discretionary easement provisions in the statutory scheme provided a mechanism for "[a]ny owner of land which does not meet the criteria for open space land" to nevertheless qualify the land for current use treatment by binding itself, in a discretionary easement conveyed to the town or city, to *"keep the land in a use consistent with the purposes of this chapter."* RSA 79-A:15, I (1991) (repealed 1996) (emphasis added). Specifically, RSA 79-A:17, I (1991) (repealed 1996) provided that "[a]ny owner of land who has received a permit to convey a discretionary easement as provided in RSA 79-A:15 may apply to the selectmen or the mayor and council to grant an easement to the town or city *not to subdivide, develop, or otherwise change the use of such land to a more intensive use* inconsistent with the purposes of this chapter." (Emphasis added.) Thus, the statutory scheme for discretionary easements provided a means for maintaining land in a use that, although not falling within the statutory definition of open space land, was deemed by the legislature to be consistent with its open space objectives.

In RSA 79-A:15, III (1991) (repealed 1996), the legislature explicitly provided that land that "is used for a golf course" was eligible to be considered for conveyance of a discretionary easement. Thus, the legislature clearly contemplated that this qualifying land would already be altered from its natural condition. We conclude that by then directing the current use advisory board to define golf course, the legislature delegated to it the authority to specify which alterations could be present without disqualifying the altered land from current use taxation. Thus, former Rev 1204.01, promulgated pursuant to a valid delegation of authority, had the force and effect of law, *Opinion of the Justices*, 121 N.H. at 559. Because we previously determined that the plain and ordinary meaning of former Rev 1204.01 is that tees, greens and similar golf course components are to be included as part of the land, we affirm the trial court's ruling that the Town cannot assess "any additional tax on the 247 acres of open space land . . . except for the agreed-upon current use amount."

The Club cross-appeals the trial court's refusal to apply this ruling retroactively and to grant the Club a refund for taxes it paid from 1992 through 2000. RSA 76:16, I (2003) provides: "Any person aggrieved by the assessment of a tax . . . may, by March 1, following the date of notice of tax under RSA 76:1-a, and not afterwards, apply in writing on the form set out in paragraph III to the selectmen or assessors for an abatement of the tax." The Club contends that it should be excused from meeting this timeliness requirement under the doctrines of equitable tolling, fraudulent concealment, and the discovery rule. Specifically, it argues that it did not challenge its tax bills for the years 1992 through 2000 because it "never actually knew nor should it have reasonably assumed that its greens, fairways, tees, sand traps and roughs were being assessed as 'Buildings' by the Town."

"[E]quitable tolling, which allows a plaintiff to initiate an action beyond the statute of limitations deadline, is typically available only if the claimant was prevented in some extraordinary way from exercising his or her rights . . . ." 51 AM. JUR. 2D *Limitation of Actions*, § 174 (2000). It "applies principally if the plaintiff is actively misled by the defendant about the cause of action." *Id.* The Club contends that the Town did mislead it by "disguising the assessments of the 247 acres of greens, fairways, sand traps, tees and roughs as 'Buildings' on the tax bills." Although the Town's categorization did not make obvious all that was actually being included, the trial court could have reasonably found that the Town's practice did not create the kind of extraordinary circumstance that would invoke equitable tolling.

■ "[T]he doctrine of equitable tolling is applicable only where the prospective plaintiff did not have, and could not have had with due diligence, the information essential to bringing suit. A party attempting to invoke that doctrine will be held to a duty of reasonable inquiry." *Protective Life Ins. Co. v. Sullivan*, 682 N.E.2d 624, 635 (Mass. 1997) (citation omitted). While exploring ways to reduce its tax burden following the 1987 revaluation, the Club could have informed itself about the Town's assessing practices. That it failed to do so supports the trial court's ruling that the doctrine of equitable tolling should not be applied. Under similar reasoning, the Club's discovery rule argument is without merit.

■ "The doctrine of fraudulent concealment is an equitable ground to justify the tolling of the statute of limitations based on the wrongful conduct of the defendant." *Conrad v. Hazen*, 140 N.H. 249, 253 (1995). The trial judge found that "the Town did not fraudulent[ly] conceal its taxing methodology." The record supports this finding. There was testimony that where a town's tax bill breaks down assessed value between land and buildings, all non-land items are listed under the category "buildings." Again, however imprecise this categorization may seem, the trial court could reasonably have found that it is not fraudulent.

Finally, the Club challenges the trial court's failure to award it attorney's fees. The Club contends that it should be awarded fees under either of the following theories: (1) It has been "forced to litigate against an opponent whose position is patently unreasonable," *Kukene v. Genualdo*, 145 N.H. 1, 3 (2000) (quotation omitted); or (2) It has been "forced to seek judicial assistance to secure a clearly defined right … [and] bad faith on the part of the [Town has been] established," *Dow v. Town of Effingham*, 148 N.H. 121 133 (2002) (quotation omitted).

■ "We will not overturn the trial court's decision concerning attorney's fees absent an unsustainable exercise of discretion." *Grenier v. Barclay Square Commercial Condo. Owners' Assoc.*, 150 N.H. 111, 115 (2003) (quotation and brackets omitted). The trial court found:

> While the defendant has not prevailed in this litigation, the Court cannot find that it acted in any way in bad faith. It put forth some evidence to justify its legal conclusion that it was permitted to tax the golf holes in addition to taxing the underlying land. Although the Court has elected not to adopt that legal conclusion, it cannot find that the position espoused by the defendant was frivolous or made with any malice.

■ We conclude that the trial court's exercise of discretion is sustainable. We have noted that "[i]t would be inappropriate to assess attorney's fees

against a litigant who contested an arguable issue of law that had not been settled by the courts." *Rix v. Kinderworks Corp.*, 136 N.H. 548, 553 (1992). Until now, we had not addressed whether such amenities as tees and greens on a golf course subject to a discretionary easement are taxable improvements to land. Thus, the issue "was a fair and reasonable ground for litigation," *Casico v. City of Manchester*, 142 N.H. 312, 318 (1997), and we accordingly affirm the denial of attorney's fees.

*Affirmed.*

BRODERICK, C.J., and DALIANIS, DUGGAN and GALWAY, JJ., concurred.