Hillsborough-southern judicial district
No. 2004-627

THE STATE OF NEW HAMPSHIRE

v.

ELEMENTIS CHEMICAL, INC.

Argued: September 29, 2005
Opinion Issued: December 9, 2005

*Kelly A. Ayotte,* attorney general (*Richard W. Head,* senior assistant attorney general, on the brief and orally), for the State.

*Wiggin & Nourie, P.A.,* of Manchester (*Gregory E. Michael* and *Gregory Holmes* on the brief); *J. Steve Barnett,* of Hightstown, New Jersey, on the brief; and *Morgan, Lewis & Bockius, LLP,* of Philadelphia, Pennsylvania (*John McAleese, III,* on the brief and orally), for the defendant.

DUGGAN, J. The plaintiff, the State of New Hampshire, appeals an order by the Superior Court (*Hampsey,* J.) dismissing the State's petition for civil forfeiture against the defendant, Elementis Chemical, Inc. (Elementis). We reverse and remand.

The following facts were adduced at trial. Elementis is in the business of distributing commercial chemical products such as acetone, hydrochloric acid, muriatic acid, chromic acid, glacial acetic acid, potassium hydroxide, sodium hydroxide, nitric acid and aqueous ammonia. In 1981, Elementis purchased property at 441 Daniel Webster Highway in Merrimack (the site). The site occupies over twelve acres of land and is bordered by the

Souhegan River to the south, Baboosic Brook to the east and Daniel Webster Highway to the north. Residential properties border the north and west boundaries.

On October 8, 1998, Elementis moved its operations from the site to a new building in Nashua. At that time, many of the buildings on the site were in various stages of disrepair. Elementis did not repair the buildings, one of which had a collapsed roof, because it intended to demolish them. Rather than immediately raze the buildings, however, Elementis rented several of them to Joseph Herlihy, the owner of a sign business. Herlihy used the buildings rent free in exchange for providing security at the site. Between October 1998 and October 2001, Herlihy was present at the site each day from approximately eight in the morning until ten at night. He provided security by patrolling the site, maintaining several "No Trespassing" signs and contacting Elementis upon seeing trespassers or unusual activity. Following its move to Nashua, Elementis hired the environmental consulting firm Arcadis, Geraghty and Miller (Arcadis) to prepare a remedial action plan to address soil and groundwater contamination at the site.

On July 26, 2001, David Bowen, a hydrogeologist with the New Hampshire Department of Environmental Services (DES), visited the site with a geologist from Arcadis to review the placement of monitoring wells in connection with the remedial action plan. Bowen observed that the site was not secured against trespassers and that dilapidated buildings remained standing.

Bowen revisited the site on August 9, 2001, accompanied by Cecil Curran, a health officer from the Town of Merrimack. Although Bowen contacted Elementis to arrange for a representative of the company to accompany him, none arrived, and Bowen and Curran proceeded to inspect the site.

Bowen and Curran began their inspection in the two southernmost buildings, which housed Herlihy's sign business. They then inspected the main mill building, Building One. Upon entering Building One, Bowen and Curran observed "numerous containers and boxes" containing chemical products, including a bottle labeled "N-methyl-pyrrolidone." Bowen and Curran also entered the basement, where Bowen detected what he described as "a very strong acrid, vinegar-like smell to that area, and when we looked with flashlights you could see almost like a mist or a haze ....[Y]ou could feel the acrid taste on your throat and in your eyes." Bowen and Curran determined that it was unsafe to venture further into the basement.

When they returned to the first floor, Bowen and Curran observed a closet with containers that appeared to hold laboratory chemicals, some

labeled and some unlabeled. At trial, Bowen said that the door to the first floor was "wide open and you could walk into the facility, and these [containers] were readily accessible to anybody that would have entered the facility." Curran described seeing "numerous bottles of lab reagents, many of them with sort of a furry residue on them, which [he had] seen before in chemical store houses where the environment in which the chemicals are stored is incompatible with them, either too much moisture or that sort of thing."

In the front office of Building One, Bowen and Curran observed two containers labeled "Hazardous Waste." On the floor of the office was a bag labeled "Corrosive" which appeared to be full of caustic soda beads. While walking on the other floors of Building One, Bowen and Curran observed some fifty-five gallon containers, one of which was covered in residue and another of which was labeled "Corrosive."

Bowen and Curran then entered an adjacent building, Building Three, where they observed two 20,000-gallon tanks containing sodium hydroxide. A portion of the roof of Building Three had collapsed onto one of the tanks and debris was on top of the tank. They observed that the piping system associated with the tanks was labeled "Caustic" and that what appeared to be dried caustic material had seeped from the end of one pipe. Bowen testified at trial that the presence of the two 20,000-gallon tanks with the collapsed roof and the crystalline material hanging from the pipe would have been sufficient grounds for issuance of an imminent hazard order. Outside Building Three, they observed an above ground storage area containing two more 20,000-gallon sodium hydroxide tanks and a third tank which contained anhydrous ammonia.

Exposure to sodium hydroxide can cause severe burns to the skin; exposure to the eyes can produce loss of eyesight. According to Bowen:

> The piping with the associated crystalline material coming out of it was directly accessible when you entered this door. It would be very easy to either knowingly or unknowingly come into contact with this material, which would cause severe burning, due to the fact that there's absolutely no water at the site, there's no way to neutralize it or stop the burning.

Elementis had shut off water at the site in 1999.

Anhydrous ammonia is an airborne particulate, which, if inhaled, can cause irreparable bodily harm. It poses an extremely high risk to human health because it generates ammonia when mixed with water. Bowen testified that, "Due to the close proximity of [neighboring] houses to the facility, any release [of anhydrous ammonia] may potentially impact those residential properties."

On August 15, 2001, DES issued an imminent hazard order (IHO) to Elementis. The IHO contained the following findings:

> [C.]6. At the time of the Inspection, DES documented that the Facility had been abandoned. The buildings and grounds were not secure, the doors were not locked and many windows were broken. Access to the site was not restricted, there was no fence surrounding the site and there were no signs to inform trespassers of the dangers posed by the site.
>
> [C.]14. [Elementis], as the owner and operator of the Facility where the waste is located, has liability under RSA 147-A:9. By abandoning this waste, [Elementis] has created an imminent threat to human health and the environment pursuant to RSA 147-A:13.
>
> [D.]1. [Elementis] through the handling and storage of the hazardous waste . . . has created an imminent hazard pursuant to RSA 147-A:13.

The IHO ordered Elementis to, among other things:

> Within thirty (30) calendar days of this Order, ensure that all hazardous waste at the Facility . . . is delivered to an authorized facility as specified in Env-Wm 511.01 and Env-Wm 507.03 via a New Hampshire authorized hazardous waste transporter. [Elementis] may reuse materials at its business upon approval by DES. During this thirty (30) day period, [Elementis] must conduct and document daily inspections of the hazardous waste containers and tanks, as per Env-Wm 509.02(a)(1), which references 40 CFR 265.15—General Inspection Requirements.

In response to the IHO, Elementis hired Clean Harbors Environmental Services (Clean Harbors) to remove the hazardous waste at a cost of approximately $100,000. Clean Harbors documented the removal of the waste using hazardous waste manifests. Generators of hazardous waste are required to prepare hazardous waste manifests when shipping hazardous waste off-site. N.H. ADMIN. RULES, Env-Wm 510.01(a). Hazardous waste manifests are "the form[s] used for identifying the origin, quantity, composition, routing and destination of hazardous waste." RSA 147-A:2 (2005).

The manifests showed that Clean Harbors removed approximately 10,000 gallons of sodium hydroxide, 2,000 gallons of anhydrous ammonia, 200 gallons of nitric acid and lesser quantities of waste flammables, oxidizers, mercury, tetrahydrofuran, bromide and chlorine. Clean Harbors

also removed non-hazardous materials from the site, for which it did not prepare manifests.

On January 24, 2002, DES issued a notice of compliance informing Elementis that it had satisfactorily complied with the IHO, but stating that "[t]his Notice of Compliance does not release [Elementis] from liability for penalties to which it may be subject for the violations identified in the [IHO]." In January 2003, the State filed a civil forfeiture action against Elementis in superior court, alleging that Elementis had violated hazardous waste laws and regulations by storing and disposing of hazardous waste without a permit. The State sought a fine of $1,100 per day for an ongoing violation which lasted 951 days, for a total fine of $1,046,100.

Elementis filed a motion *in limine* to exclude evidence of the manifests as subsequent remedial measures under New Hampshire Rule of Evidence 407. By order dated May 19, 2004, the trial court denied the motion because "the disposal of materials was not made out of a sense of social responsibility but only because the remedial measure was required by an order from the State."

The trial court conducted a three-day bench trial and dismissed the State's civil forfeiture claim. In its order dated July 20, 2004, the trial court reversed itself and excluded the manifests from evidence, finding:

> [T]he interests of fairness dictate that the manifests may not be used as evidence to retroactively identify the waste as "hazardous." The reasoning underlying this conclusion is analogous to the reasoning that prevents the introduction of subsequent remedial measures as evidence of a party's liability. . . . The controlling justification for excluding evidence of subsequent remedial measures is a public policy concern that people would not repair their property after an accident if such measures could be used against them in a lawsuit. . . . [S]hould the [trial court] rely on the manifests [as] evidence of the "hazardous" nature of the waste, other companies would have little incentive to dispose of any materials as "hazardous waste" for fear that such disposal could be used against them in a future court proceeding. Furthermore, it would be fundamentally unfair for the Court to punish Elementis for appropriately responding to the IHO by using its response as evidence against it in a subsequent trial.

The trial court then found that, without the manifests, the State did not produce sufficient evidence to establish that the waste was hazardous waste between 1998 and 2001.

On appeal, the State argues: (1) that the trial court erred in excluding the manifests; and (2) that the trial court should have found sufficient evidence to conclude that Elementis' waste was hazardous between 1998 and 2001. On cross-appeal, Elementis argues that the trial court erred by ruling that Elementis had abandoned materials at the site and that those materials thereby became wastes under RSA chapter 147-A.

## I. Exclusion of the Manifests

The State contends that the trial court should not have excluded the manifests from evidence. Specifically, the State argues that the trial court erred in justifying exclusion based upon the policy concerns underlying the rule regarding subsequent remedial measures.

"We will not reverse a trial court's ruling on the admissibility of evidence absent an unsustainable exercise of discretion." *McIntire v. Lee*, 149 N.H. 160, 168 (2003). "When we determine whether a ruling made by a judge is a proper exercise of judicial discretion, we are really deciding whether the record establishes an objective basis sufficient to sustain the discretionary judgment made." *State v. Lambert*, 147 N.H. 295, 296 (2001).

New Hampshire Rule of Evidence 407 makes inadmissible evidence of subsequent remedial measures to prove negligent or culpable conduct. However, in order for an act to constitute a subsequent remedial measure, it must be voluntarily undertaken by the defendant. *See Raymond v. Raymond Corp.*, 938 F.2d 1518, 1524 (1st Cir. 1991) (applying Federal Rule of Evidence 407, which is identical in all relevant respects to New Hampshire Rule of Evidence 407).

Although the trial court found that, in light of the mandate in the IHO, removal of hazardous waste was not a subsequent remedial measure, it applied policies underlying Rule 407 to find that the "interests of fairness" required exclusion of the manifests. The trial court based its reasoning on *McIntire*, where we stated that "the controlling justification for excluding evidence of subsequent remedial measures is a public policy concern that people may not repair their property after an accident if such measures could be used against them in a lawsuit." *McIntire*, 149 N.H. at 168. We have described the public policy underlying Rule 407 in the context of negligence:

> The more careful a person is, the more regard he has for the lives of others, the more likely he would be to [undertake subsequent remedial measures], and it would seem unjust that he could not do so without being liable to have such acts construed as an admission of prior negligence. We think such a rule puts an

unfair interpretation upon human conduct, and virtually holds out an inducement for continued negligence.

*Cyr v. J.I. Case Co.*, 139 N.H. 193, 204 (1994).

■ Rule 407 excludes evidence of subsequent remedial measures because admitting this evidence would be unfair to the person who voluntarily remedies a hazardous condition. *See id.* "Voluntary" is defined as "acting or done without any present legal obligation to do so." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2564 (unabridged ed. 2002). When a person remedies a hazardous condition pursuant to a statutory obligation, the remediation is not voluntary. The fairness concerns underlying Rule 407 do not require exclusion of involuntary acts of remediation.

■ Generators of hazardous waste who cease operations have a statutory obligation to either recycle the hazardous waste or dispose of it by shipping it off-site. N.H. ADMIN. RULES, Env-Wm 506.01(e). Generators who ship hazardous waste off-site are required to prepare a hazardous waste manifest to document the nature of the hazardous waste. N.H. ADMIN. RULES, Env-Wm 510.01(a). Elementis had a statutory obligation to dispose of the hazardous waste by shipping it off-site and did not dispose of the hazardous waste voluntarily. Thus, the fairness concerns underlying Rule 407 do not provide an objective basis for excluding the manifests.

Elementis argues that allowing the manifests into evidence is unfair because Elementis could have chosen to recycle the chemicals at its Nashua facility "had it known that the state would use the manifests as evidence of hazardous waste for the years between 1998 and 2001." Elementis also argues that the language of the IHO, which stated that, "[Elementis] may reuse [the] materials at its business upon approval by DES," conferred on Elementis the right to choose whether the waste identified in the IHO was hazardous waste or reusable material.

At trial, Elementis presented evidence that it could have sold the chemicals at the site to certain customers. Elementis did not, however, actually sell any of the chemicals at the site after 1998. Even if Elementis intended to someday reuse the chemicals, it still had to comply with a legal duty to perform a hazardous waste determination and obtain storage permits from DES for all hazardous waste on the site within ninety days of ceasing operations. N.H. ADMIN. RULES, Env-Wm 502.01, 507.02. The language of the IHO does not confer on Elementis the right to choose whether to sell the material, but instead advises Elementis that it may be

able to reuse some materials if they meet commercially acceptable standards, subject to DES oversight.

Elementis argues that, even if Rule 407 or the policy considerations underlying Rule 407 do not provide a basis for excluding the manifests, the manifests were properly excluded under New Hampshire Rule of Evidence 403. Specifically, Elementis asks us to find, based on the trial judge's statement that "it would be fundamentally unfair for the Court to punish Elementis," that the trial judge relied on not only Rule 407, but also Rule 403, and acted within his discretion under Rule 403 by excluding the manifests. However, Elementis never moved to exclude the manifests under Rule 403. Moreover, the trial judge's decision does not cite to Rule 403 and does not balance the probative value of the manifests against the danger of unfair prejudice. We reject Elementis' invitation to construe the trial judge's ruling as relying on Rule 403.

We conclude that by excluding the manifests from evidence, the trial judge engaged in an unsustainable exercise of discretion.

*II. Hazardous Waste*

We next consider whether the evidence compels a finding that the waste was hazardous waste between 1998 and 2001. The trial court conducted a three-step analysis, first finding that, "Elementis abandoned the materials on October 8, 1998, the date when it ceased operations at the [s]ite and moved its operations to the Nashua location." Second, it found that "[u]pon abandonment, the materials became 'waste.'" Third, it found that, without the manifests, there was insufficient evidence to establish that the waste was hazardous waste.

After concluding that the manifests were improperly excluded, this court would ordinarily reverse and remand. *See, e.g., McDill v. Environamics Corp.*, 144 N.H. 635, 641-42 (2000). However, in this case, the manifests were initially admitted into evidence and were not excluded until after the trial had concluded and Elementis had the opportunity to challenge them. Under these circumstances, we conclude that it is appropriate for us to review the record, including the manifests that were excluded by the trial court, to determine whether a reasonable fact finder would be compelled to reach a particular result. If, on this record, a reasonable fact finder would necessarily reach a certain conclusion, then we may decide that issue as a matter of law. *Cf. Appeal of Cote*, 139 N.H. 575, 580 (1995). Accordingly, we next consider whether, on the record before us including the manifests, a reasonable fact finder would necessarily find that the waste was hazardous between 1998 and 2001.

Elementis argues that the material at the site was not "abandoned." It argues that "abandoned" is not defined in either RSA chapter 147-A or the

administrative rules and asks us to adopt the common law definition. Under this approach, the State would have to prove that Elementis demonstrated both the intent to abandon the material and an overt act of abandonment. *Lawlor v. Town of Salem*, 116 N.H. 61, 62 (1976).

We disagree with Elementis' contention that there is no applicable definition of "abandoned." The administrative rules define an "abandoned material" as any material that is:

a. Disposed of;
b. Burned or incinerated; or
c. Accumulated, stored, or treated, but not recycled, before or in lieu of being abandoned by being disposed of, burned, or incinerated.

N.H. ADMIN. RULES, Env-Wm 110.01(c)(1). "We have often stated that we will not interpret a statute to abrogate the common law unless the statute clearly expresses that intent." *Sweeney v. Ragged Mt. Ski Area*, 151 N.H. 239, 241 (2004). By defining "abandoned material," the administrative rule abrogates the common law definition of "abandoned." We therefore reject Elementis' claim that the common law definition applies.

The trial court applied the definition of "abandoned material" in finding that the material was abandoned. Here, neither the code nor statute defines "accumulated" or "stored" as the words are used in the definition of "abandoned material." *See* N.H. ADMIN. RULES, Env-Wm 110.01.

We review the trial court's interpretation of statutes *de novo*. *Monahan-Fortin Properties v. Town of Hudson*, 148 N.H. 769, 771 (2002). In interpreting statutes, we ascribe the plain and ordinary meanings to the words used. *Sweeney*, 151 N.H. at 241. Where a term or phrase is not specifically defined, we look to other provisions of the statutory scheme for guidance. *See id.* at 242. Rules adopted by administrative agencies may not add to, detract from, or in any way modify statutory law and may "fill in details to effectuate the purpose of the statute." *Portsmouth Country Club v. Town of Greenland*, 152 N.H. 617, 621 (2005). Rules and regulations promulgated by administrative agencies, pursuant to a valid delegation of authority, have the force and effect of laws. *Id.* It therefore follows that where terms or phrases in an administrative agency rule are not specifically defined, we may look to provisions not only within the statute, but within other rules promulgated pursuant to the statute for guidance. *Cf. id.* We review the interpretation of administrative rules *de novo*.

The statute defines "storage" as "the containment of hazardous wastes, either on a temporary basis or for a period of years, in such a manner as not to constitute disposal of the hazardous wastes." RSA 147-A:2, XIII.

Thus, "storage" of a material requires its containment, either temporarily or for years, without disposal. A "stored" material, then, is one that has been contained, either temporarily or for years, without being disposed of.

At trial, James Grady, who was district manager of Elementis between 1998 and 2001, testified that no material was removed from the site between October 8, 1998, and August 15, 2001. Grady's testimony was corroborated by the testimony of David Tinsch, a maintenance worker at Elementis who made weekly visits to the site, and who stated that he was unaware of any material being transported from the site to Nashua during this time. The material at the site was contained and not disposed of between October 8, 1998, and August 15, 2001, and was "stored . . . in lieu of being abandoned by being disposed of." N.H. ADMIN. RULES, Env-Wm 110.01(c)(1). Thus, the trial court reasonably found that the material became "abandoned material" on October 8, 1998.

In the second step of its analysis, the trial court considered the statutory definition of "waste," which is "any matter consisting of . . . *abandoned material* including solid, liquid, semi-solid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities." RSA 147-A:2, XVIII (2005) (emphasis added). After finding that the material was abandoned, the trial court reasonably found that it was "waste."

Finally, we consider whether the trial court, considering the manifests, would necessarily find that the waste was hazardous waste. A "hazardous waste" is defined as "a solid, semi-solid, liquid or contained gaseous waste, or any combination of these wastes . . . which has been identified as a hazardous waste by [DES] using the criteria established under RSA 147-A:3, I." RSA 147-A:2. The manifests identified the material removed from the site as "hazardous waste" using statutory criteria for characterizing hazardous waste. *Id.* The record shows that the hazardous waste identified in the manifests in 2001 was the same waste present at the site from October 8, 1998. Thus, a reasonable fact finder would necessarily find that the material at the site between 1998 and 2001 was hazardous waste. We remand this case for determination of civil forfeiture penalties.

*Reversed and remanded.*

BRODERICK, C.J., and DALIANIS, J., concurred.